IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AEROSPACE SOLUTIONS, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:24-CV-1383-RP |
| GLENN A. HEGAR, JR., *in his official capacity as Texas Comptroller of Public Accounts*, | § § § § § | |
| Defendant. | § § | |

## ORDER

Before the Court is Defendant Glenn A. Hegar, Jr.'s ("Defendant") Motion to Dismiss Plaintiff Aerospace Solutions, LLC's ("Plaintiff") Complaint, (Dkt. 1). (Dkt. 18). Plaintiff filed a response, (Dkt. 20), and Defendant replied, (Dkt. 21). Also before the Court is the Parties' Joint Motion to Extend Scheduling Order Deadlines. (Dkt. 31). Having considered the parties' briefs, the record, and the relevant law, the Court finds that the Motion to Dismiss should be granted and therefore finds that the Motion to Extend Scheduling Order Deadlines is moot.

## I. BACKGROUND

Plaintiff brings this case to contest the constitutionality of the Texas Historically Underutilized Business ("HUB") Program. Specifically, Plaintiff asserts that the HUB Program "favor[s] some businesses over others based on the race of their owners," such that it "violates the Equal Protection Clause's demand that the government not discriminate on the basis of race." (Compl., Dkt. 1, at 2).

Plaintiff Aerospace Solutions, a subsidiary of Open Holdings, LLC, provides staffing services to the aerospace and transportation industries. (*Id.* at 6). Plaintiff alleges that it hopes to enter into public sector contracting and "wants to compete for Texas state contracts." (*Id.* at 7).

1

Defendant Glenn A. Hegar, Jr., who is sued in his official capacity, is the Texas Comptroller of Public Accounts. (*Id.* at 3). In that role, he is the head of the agency responsible for administering the HUB Program. (*Id.*).

The Texas HUB Program, as relevant here, is part of the process for allocating some Texas state government contracts. The purpose of the HUB program is to "promote full and equal business opportunities for all businesses in an effort to remedy disparity in state procurement and contracting," which the program does by "encourag[ing] the use of [HUBs]." 34 Tex. Admin. Code § 20.281. HUBs are defined as businesses based in Texas owned by "economically disadvantaged persons." Tex. Gov't Code § 2161.001(2). "Economically disadvantaged person" is, in turn, defined to mean an individual who either (1) "is economically disadvantaged because of the person's identification as a member of a certain group," including "Black Americans," "Hispanic Americans," "women," "Asian Pacific Americans," "Native Americans," and "veterans . . . who have suffered at least a 20 percent service-connected disability" or (2) "has suffered the effects of discriminatory practices or other similar insidious circumstances." Tex. Gov't Code § 2161.001(3).

As set out in Tex. Gov't Code Chapter 2161 and 34 Tex. Admin Code § 20.281 et. seq., the program works as follows. Across the state, to achieve the goal of increasing state contracting with HUBs, the program sets goals for percentage of HUB utilization in both state purchases of goods and services and state construction contracts. Tex. Gov't Code § 2161.81–82. Therefore, by category—e.g., "heavy construction" or "professional services"—there are "statewide HUB utilization goals": percentages of the value of contracts that the state aims to award to HUBs. Tex. Admin Code § 20.284(b). These statewide HUB utilization goals serve as a "starting point" for agencies to set their own individual HUB utilization goals, which may be set "higher or lower than the statewide utilization goals." Tex. Admin. Code § 20.284(a)-(c). Agencies must then make "a good faith effort to assist HUBs in receiving a portion of the total value of all contracts that the state

2

agency expects to award in a fiscal year"—a good-faith effort that is demonstrated in part by the agency's performance in meeting or exceeding its HUB utilization goals. Tex. Admin Code § 20.284(d)–(e).

With those statewide and agency-level goals set, the HUB program then applies to the process for selecting contractors for individual state contracts. Specifically, when a state agency "considers entering into a contract with an expected value of $100,000 or more," that agency must "determine whether there will be subcontracting opportunities under the contract." Tex. Gov't Code § 2161.252(a). If subcontract opportunities are "probable," the agency must require that each bid for the contract includes a "historically underutilized business subcontracting plan" ("HUB Subcontracting Plan" or "HSP"). *Id.* Under those circumstances, a bid "must contain a[n HSP] to be considered responsive." Tex. Gov't Code § 2161.252(b).

Each respondent to the contract opportunity therefore includes an HSP in their bid for the state contract. And, as 34 Tex. Admin. Code § 20.285(d) explains, the HSP "must demonstrate that the respondent developed it in good faith." Specifically, there are five options for a respondent to demonstrate good faith in completing the HSP, the four most relevant of which are summarized below:[1]

(1) "Solicitation Method": the respondent shows that it solicited HUBs to fill subcontracting opportunities, demonstrated by submitting evidence that the respondent notified trade organizations and HUBs of subcontracting opportunities. The respondent must include a written justification for why it selected a non-HUB if a HUB bid for the same work.

(2) "All-HUB-Subcontractors Method": the respondent submits documentation that it is only using HUBs for all subcontracting opportunities.

---

[1] The fifth method is "Subcontracting to a HUB Protégé": if the respondent is part of a HUB mentor-protégé program, they can demonstrate good faith effort by subcontracting any subcontracting opportunity to their protégé. *See* 34 Tex. Admin. Code § 20.285(d)(5). This method is not relevant to the specific claims of Plaintiff, nor is it otherwise useful in understanding the general structure of the HUB program as laid out by statute, so for simplicity and clarity's sake, it is not discussed further here.

3

    (3) "Meeting-or-Exceeding-HUB-Goal Method": the respondent shows that it is subcontracting with HUBs for a high enough proportion of subcontracting opportunities to meet or exceed the relevant HUB utilization goal.

    (4) "Self-performing Method": the respondent "may . . . demonstrate a good faith effort [in completing the HSP] for any subcontracting opportunity by providing a statement of how it intends to fulfill the entire contract, including each subcontracting opportunity, with its own equipment, supplies, materials, and employees."

*See* 34 Tex. Admin. Code § 20.285(d)(1)–(4).

Therefore, as written, the HUB program essentially says that any contractor fulfilling a state contract where there are likely to be subcontracting opportunities needs to either: (1) use HUBs for those subcontracting opportunities (at least sufficiently to meet the HUB utilization goal); (2) have at least informed HUBs about the subcontracting opportunities and justify why the contractor selected non-HUB subcontractors (presumably, for example, by indicating that non-HUBs were lower cost); or (3) indicate that there actually will not be subcontracting opportunities because the contractor will perform all work itself.

Plaintiff alleges that this program places it, a non-HUB, at a disadvantage. "Despite identifying state contracts it was qualified, willing, and able to bid on, the significant HUB utilization goals for services contracts have prevented Aerospace Solutions from expanding into the public sector work with Texas state agencies." (Compl., Dkt. 1, at 8).

Based on these allegations, Plaintiff asserts two causes of action: a violation of the Equal Protection Clause of the Fourteenth Amendment, brought through 42 U.S.C. § 1983, and a violation of 42 U.S.C. § 1981. (Compl., Dkt. 1, at 9–10). Defendant filed a motion to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1) and for failure to state a claim upon which relief can be granted under Rule 12(b)(6). (Mot. to Dismiss, Dkt. 18). Plaintiff responded, (Dkt. 20), and Defendant replied, (Dkt. 21).

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) *cert. denied*, 536 U.S. 960 (2002). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

### 1. Standing

Article III of the Constitution limits the jurisdiction of federal courts to "cases and controversies." U.S. Const. art. 3, § 2. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To demonstrate standing, a plaintiff must show: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 578

5

U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). "For purposes of ruling on a motion to dismiss for want of standing, both the . . . courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501.

This pleading standard incorporates some form of plausibility requirement. *See Cornerstone Christian Sch. v. Univ. Interscholastic League,* 563 F.3d 127, 134 (5th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) ("on a motion to dismiss, plaintiffs must allege facts that give rise to a plausible claim of . . . standing."). It is not, however, entirely clear whether that plausibility requirement is the same as that articulated by the Supreme Court in the context of a Rule 12(b)(6) motion to dismiss—i.e., that the complaint must state a claim that is plausible on its face after conclusory allegations and conclusions of law are discarded. *See Ashcroft v. Iqbal*, 556 U.S. 662, (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (establishing plausibility requirements in the Rule 12(b)(6) context); *see also Martone v. Robb*, 902 F.3d 519, 523 (5th Cir. 2018) (citing *Twombly* and *Iqbal* to explain that "'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions' or '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'"). At least one circuit has explicitly said that, when facing a Rule 12(b)(1) challenge, "the plaintiff must meet a pleading burden paralleling the *Twombly-Iqbal* facial plausibility requirement." *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 528 (7th Cir. 2024); *see also In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.,* 87 F.4th 315, 320 (6th Cir. 2023) (applying *Twombly* to the standing analysis at the pleading stage). The Supreme Court has also seemingly treated plausibility under the two rules as at least sometimes interchangeable—albeit in footnoted dicta. *See Brownback v. King*, 592 U.S. 209, 218 n.8 (2021) ("In cases such as this one where a plaintiff fails to plausibly allege an element that is both a merit

6

element of a claim and a jurisdictional element, the district court may dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6).").

Similarly, the Fifth Circuit has, at times, appeared to treat the standard from *Twombly* and *Iqbal* as applying to *all* motions to dismiss, without distinguishing between Rules 12(b)(1) and (6). *See Inclusive Louisiana v. St. James Par.,* 134 F.4th 297, 304 (5th Cir. 2025), *cert. denied sub nom. St. James Par., LA v. Inclusive LA,* No. 25-195, 2025 WL 2949577 (U.S. Oct. 20, 2025). However, as far as this Court is aware, the Fifth Circuit has not taken an explicit position on this question.

Considering both the importance of standing under Article III, as well as judicial economy, it seems reasonable to conclude that courts are no more required to accept legal conclusions and conclusory factual allegations when ruling on a motion to dismiss for lack of standing than they are when ruling on a motion to dismiss for failure to state a claim. On the other hand, it is clear that the evidence courts can consider under Rules 12(b)(1) and (6) varies. *See Lane,* 529 F.3d at 557 (noting that a Rule 12(b)(6) analysis is confined to the complaint and its attachments, but a court can look beyond the complaint and resolve disputed facts in ruling on a Rule 12(b)(1) motion; *see also Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (discussing the difference between facial and factual challenges under Rule 12(b)(1) and the resulting differences in burden—a distinction without parallel under Rule 12(b)(6)).[2] This evidentiary difference between Rules 12(b)(1) and (6) might imply that the plausibility requirement varies as well—though it does not necessarily imply that the burden to plead standing should be *lower* than the burden to plead a claim upon which relief can be granted. However, given this background of uncertainty, in this Order the Court will only note—but not rely

---

[2] As an additional complication to this question, it is unclear whether or how the distinction between a "facial" and a "factual" attack on standing interacts with the requirement for pleading to be plausible. *See, e.g., Liu v. U.S. Dep't of Homeland Sec.*, No. 3:24-CV-0298-G, 2025 WL 2773900, at *3–5 (N.D. Tex. Sept. 26, 2025) (noting the distinction between a facial attack on standing, which requires the court to presume allegations to be true, and a factual attack, which requires the court to weigh evidence, but declining to accept "bare assertions" as sufficient to support standing even where an attack was facial).

7

on—the effect of applying a pleading standard like that for Rule 12(b)(6) to Plaintiff's standing allegations.

Assuming a plaintiff has made sufficient allegations in support, injury for an equal protection challenge can be alleged by showing simply that a barrier to equal access exists, without showing that the plaintiff would in fact have received the benefit in question without that barrier in place—at least where a government program functions as a "set aside" for a particular group delineated along protected lines. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 508 U.S. 656, 666 (1993). As the Supreme Court has explained, "[t]he 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.*[3]

### B. Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Twombly*, 550 U.S. at 555). That is, "a complaint must contain sufficient factual matter, accepted as

---

[3] In *Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S. at 667–68, the Supreme Court did leave open the question of whether it is necessary that a contractor have "regularly bid" for the kind of contracts for which it alleges a discriminatory barrier exists in order to have standing to challenge that barrier—as the contractor in that case had. Here, however, because the Court finds that Plaintiff's claim fails for other reasons, discussed below, this distinction is not dispositive.

8

true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.

A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### III. DISCUSSION

#### A. Defendant's Motion to Dismiss Under Rule 12(b)(1)

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The Court therefore begins by

considering Defendant's motion to dismiss Plaintiff's complaint for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1). Defendant argues that Plaintiff has failed to sufficiently allege each element of standing—injury, causation, and redressability. (Mot. to Dismiss, Dkt. 18, at 23).

The Court begins by considering injury. Plaintiff alleges that it is harmed by the HUB program because "the significant HUB utilization goals for services contracts have prevented Aerospace Solutions from expanding into . . . public sector work with Texas state agencies." (Compl., Dkt. 1, at 8). This is because—in Plaintiff's reading—the HUB program places Plaintiff at a disadvantage relative to HUBs that are themselves bidding on contracts, which has led Plaintiff to decline to bid on contracts it alleges it was otherwise "qualified, willing, and able to bid on." (*Id.*).

Plaintiff points to one such contract in its complaint: a 2023 Texas Department of Transportation request for proposal ("RFP"). (*Id.*; *see also* Compl. Ex. 1, Dkt. 1-1). Because the Department of Transportation identified the contract as likely having subcontracting opportunities, that RFP had a 26% HUB utilization goal and required each respondent to submit an HSP. (Compl., Dkt. 1, at 8; Compl. Ex. 1, Dkt. 1-1, at 55). This means that Plaintiff, if it had bid, would have had to use one of the methods discussed above to show good-faith effort in completing an HSP—for example, soliciting HUBs for any subcontracting opportunities or certifying self-performance of the entire contract. (Compl. Ex. 1, Dkt. 1-1, at 55–57).

Critically, Plaintiff reads the self-performing option at 34 Tex. Admin. Code §20.285(d)(4) to mean that "the bidder will self-perform by fulfilling the entire contract—**including the HUB utilization goal**—with its own equipment, supplies, materials, or employees." (Compl., Dkt. 1, at 5–6) (emphasis added). This means that, in Plaintiff's view, "HUB bidders could fulfill the 26% HUB utilization goal through self-performance" but Plaintiff, a non-HUB, could not. (*Id.*). Plaintiff believed it was therefore effectively "required to subcontract with a HUB," in order to fulfill the utilization goal—which Plaintiff alleges would have "required [it] to give away over a quarter of the

10

contract's value to a competitor for work that [Plaintiff] could otherwise do in-house." (Compl., Dkt. 1, at 8). In turn, Plaintiff "would have had to price its bid higher to compensate for the percentage of the total contract value that would be given away to a HUB subcontractor." (*Id.*). Therefore, "[i]nstead of taking the time and effort to submit a non-competitive bid, [Plaintiff] chose not to respond to the Texas Department of Transportation RFP." (*Id.*). This sequence, beginning with the requirement for an HSP, is the "imposition of [a] barrier" to receiving government contracts that forms the basis of Plaintiff's injury allegation. *See Ne. Fla. Chapter of Associated Gen. Contractors*, 508 U.S. at 666.

The critical allegation at the start of this chain of reasoning is the idea that the self-performing method requires the respondent to certify that it will fulfill the HUB utilization goal and therefore the idea that the self-performing method effectively requires the respondent to be a HUB. Plaintiff cites only the statutory language itself for this assertion. (*See* Compl., Dkt. 1, at 5–6). However, the statute simply does not say that a respondent who is self-performing must meet the HUB utilization goal or itself be a HUB. The language that Plaintiff includes in its complaint when describing the requirements for a self-performing respondent—"including the HUB utilization goal"—does not appear in the statute. Nor does it seem to be implied. Take, for example, the specific evidence that a self-performing respondent may be required to provide to the agency: (1) "evidence of existing staffing to meet contract objectives," (2) "monthly payroll records showing employees engaged in the contract," (3) "on-site reviews of company headquarters or work site where services are to be performed," and (4) "documentation proving employment of qualified personnel holding the necessary licenses and certificates required to perform the work." 34 Tex. Admin. Code § 20.285(d)(4)(A)–(D). This is all documentation focused on the respondent's ability to perform the actual work required by the contract, not the HUB utilization goal.

11

Moreover, considering the other methods for demonstrating a good-faith effort to complete an HSP shows that Plaintiff's reading is contrary to the plain meaning of the statute. As summarized above, a respondent completing an HSP can show that it (1) solicited HUB subcontractors (even if it did not hire them), (2) is using all HUB subcontractors, (3) is using enough HUB subcontractors to meet the utilization goal, or (4) is self-performing. 34 Tex. Admin. Code § 20.285(d)(1)–(4). If any contractor selected *must* meet the HUB utilization goal, as Plaintiff suggests, the solicitation method would be meaningless. In Plaintiff's reading, every single respondent would necessarily either be (1) using all HUB subcontractors, (2) using enough HUB subcontractors to meet the utilization goal, or (3) a HUB self-performing and therefore meeting the utilization goal. There would be no point in having an additional method allowing a respondent to simply certify that it presented subcontracting opportunities to HUBs and then to explain why it had not selected those HUBs, assuming it did not.

In its response to Defendant's Motion to Dismiss, Plaintiff contests this reading by asserting that "if a non-HUB like Aerospace could satisfy a contract's HUB utilization goal, the HUB program would be self-defeating. It would be impossible for the HUB program to achieve its stated purpose of "encourag[ing] the use of historically underutilized businesses." (Resp., Dkt. 20, at 16). Plaintiff argues that this reading of the statute is therefore "absurd" and "should be avoided." (*Id.*).

The Court is not convinced by this assertion. The HUB program's goal is to "encourage the use of historically underutilized businesses." 34 Tex. Admin. Code § 20.281. A program that requires any contractor who is seeking a government contract and who intends to subcontract to, at a minimum, present those subcontracting opportunities to HUBs, document that step, and then, should the contractor then not accept bids by HUBs, explain why it did not select the HUBs' bids, seems perfectly capable of encouraging the use of HUBs.[4] Such a program in no way seems to be an

---

[4] The Court notes here, as discussed above, that the HUB program only applies to contracts where subcontracting opportunities are "probable," as determined by the state agency. Tex. Gov't Code § 2161.252(a). That means both that (1) presumably many respondents bidding for such contracts will be

12

absurd fit for that purpose—certainly not absurd enough to discard the plain language of the statute by reading in additional clauses.

Plaintiff suggests, in its reply, that even if the Court disagrees with its reading of the statute, it has still alleged that the HUB program is in fact administered in a discriminatory manner. (Resp., Dkt. 20, at 18). Specifically, Plaintiff suggests it has pled discrimination in the application of the program in the following paragraphs of its complaint: 5, 47, and 52–54. The Court considers those paragraphs, reproduced below, to see if Plaintiff has "allege[d] facts that give rise to a plausible claim of . . . standing." *Barilla v. City of Houston, Texas*, 13 F.4th 427, 431 (5th Cir. 2021)

> Paragraph 5: "Plaintiff Aerospace Solutions relocated to Texas because of its business-friendly climate and with an eye towards expanding into public sector contracts. **However, because Aerospace Solutions does not qualify as a HUB, it is at a significant disadvantage when bidding on state contracts**."
>
> Paragraph 47: "**The HUB Program treats businesses differently based on the race of their owners**."
>
> . . .
>
> Paragraphs 52–54: "**Because the HUB Program uses racial classifications to award public contracts, furthers no compelling interest, and is not narrowly tailored, it violates the Equal Protection Clause**. . . . **Pursuant to the HUB Program, Defendants use race as a negative when evaluating bids**. . . . **Pursuant to the HUB Program, Defendants stereotype individuals and businesses on the basis of race**."

(Compl., Dkt. 1, at 2, 9–10 (emphasis added)).

As discussed in more detail in the Court's 12(b)(6) analysis, below, these allegations appear to be conclusory. Moreover, as indicated above, the Court is highly skeptical of Plaintiff's reading of the statute here. Therefore, were it clear that the plausibility standard from *Twombly* and *Iqbal* applies under Rule 12(b)(1)—and that the Court should set aside Plaintiff's legal conclusions and conclusory

---

interested in subcontracting—and therefore will at least solicit HUB subcontractors—and (2) having a carveout for respondents who are not subcontracting (the self-performing option) at all is in fact in line with the overall scope of the program.

factual allegations—the Court would likely dismiss on the grounds of standing. However, in light of the uncertainty regarding plausibility requirements for pleading standing, discussed above, the Court will, for now, follow Plaintiff's suggestion of the law's meaning and weigh Plaintiff's allegations about the application of the HUB program.

Doing so, the Court finds that, under Plaintiff's reading of the law, Plaintiff has alleged a barrier to equal access to state contracting opportunities: namely that, for contracts where an HSP is required, non-HUBs could not self-perform and therefore would have to subcontract, while HUBs could self-perform. Accepting Plaintiff's reading of the law, Plaintiff has therefore alleged an injury. That injury is caused by Defendant and would be redressed by the Court finding the HUB program unlawful. Therefore, with the reservations noted above, the Court will therefore deny Defendant's motion to dismiss under Rule 12(b)(1).

### B. Defendant's Motion to Dismiss Under Rule 12(b)(6)

The Court turns now to Defendant's motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). Under Rule 12(b)(6) Plaintiff unquestionably has the burden of plausible pleading, and the Court cannot accept either Plaintiff's factually unsupported "legal conclusions" nor its "conclusory statements." *Iqbal*, 556 U.S. at 678.

Plaintiff's allegations about the plain meaning of the statute establishing the HUB program—a question of law—have been discussed above. Because the plain language of the statute does not align with Plaintiff's suggested reading, and because even at the pleading stage, the Court does not simply accept Plaintiff's legal conclusions, the Court finds that Plaintiff's Complaint fails to state a claim for which relief can be granted based on the facial meaning of the law. The HUB program does not, on its face, burden Plaintiff in the way that Plaintiff suggests—and there can be no plausible claim for relief from an illusory burden.

However, even if the HUB program does not burden Plaintiff on its face, it is possible that it could burden Plaintiff in practice, as applied. The Court therefore weighs Plaintiff's factual allegations about the application of the program in more detail here. In its response to Defendant's Motion to Dismiss, Plaintiff directed the Court to the paragraphs of its Complaint where it asserts it alleged discrimination in the application of the program. (Resp., Dkt. 20, at 18). Taking those allegations in turn:

At paragraph 5 of the Complaint, Plaintiff asserts that "because Aerospace Solutions does not qualify as a HUB, it is at a significant disadvantage when bidding on state contracts." (Compl., Dkt. 1, at 2). This is a quintessentially conclusory statement: it simply states the conclusion that Plaintiff is disadvantaged instead of alleging specific facts that would allow the Court to draw that inference.

Next, at paragraph 47, Plaintiff states that "[t]he HUB Program treats businesses differently based on the race of their owners." (Compl., Dkt. 1, at 9). This statement is likewise entirely conclusory—it contains no specific factual allegations for the Court to evaluate, only the baseline assertion of discrimination.

At paragraph 52, Plaintiff asserts that "[b]ecause the HUB Program uses racial classifications to award public contracts, furthers no compelling interest, and is not narrowly tailored, it violates the Equal Protection Clause." (*Id.*). This is barely more than a legal conclusion, and exactly the kind of "threadbare recital[] of the elements of a cause of action, supported by mere conclusory statements" identified as insufficient by the Supreme Court. *See Iqbal*, 556 U.S. at 678. Similarly, Plaintiff offers only conclusory statements at paragraphs 53 and 54 of its Complaint, where it says that "[p]ursuant to the HUB Program, Defendants use race as a negative when evaluating bids," and "stereotype individuals and business on the basis of race" with no more specific allegations to support those assertions. (Compl., Dkt. 1, at 9–10).

Additionally, when considering how the HUB program is applied in practice, Plaintiff's own exhibit to its complaint undercuts its claims. The Texas Department of Transportation RFP that Plaintiff submitted as an attachment to its complaint—Plaintiff's sole example of a contract that the HUB Program prevented it from bidding on—states that "[b]eing a certified HUB does not exempt a respondent from completing the HSP requirement." (Compl. Ex. 1, Dkt. 1-1, at 55). In other words, HUBs and non-HUBs alike face the burden of completing an HSP. Moreover, that same RFP details the information that must be provided by a self-performing respondent. Like the statutory language, the RFP makes no mention of a self-performing respondent providing information related to meeting the HUB utilization goals. (*See id.* at 57). Instead, the RFP requires that a self-performing respondent provide information related to their ability to complete the contracted "Scope of Work"—undercutting both Plaintiff's proposed reading of the statute as including HUB goals in the self-performing method and Plaintiff's allegations of as-applied discrimination.[5]

In short, Plaintiff's reading of the statute is divorced from the statute's plain, facial meaning, and Plaintiff has provided no non-conclusory allegations that the statute is enforced in a way that differs from its plain meaning. As a result, Plaintiff has not alleged that it faces actual burdens from the HUB Program sufficiently to "raise [its] right to relief above the speculative level.'" *Cuvillier,* 503

---

[5] In full: "[w]hen the respondent plans to complete all contract requirements with its own equipment, supplies, materials and/or employees, it is still required to complete an HSP. The respondent must complete the 'Self-Performance Justification' portion of the HSP, and attest that it does not intend to subcontract for any goods or services, including the class and item codes identified in Section I.3.5. In addition, the respondent must identify the sections of the proposal that describe how it will complete the Scope of Work using its own resources or provide a statement explaining how it will complete the Scope of Work using its own resources. The respondent must agree to comply with the following if requested by the Department: provide evidence of sufficient respondent staffing to meet the solicitation requirements, provide monthly payroll records showing the respondent staff fully dedicated to the contract, allow the Department to conduct an onsite review of company headquarters or work site where services are to be performed, and, provide documentation proving employment of qualified personnel holding the necessary licenses and certificates required to perform the Scope of Work."

F.3d at 401 (citing *Twombly*, 550 U.S. at 555). The Court will therefore grant Defendant's Motion to Dismiss, (Dkt. 18), for failure to state a claim upon which relief can be granted.

## IV. CONCLUSION

For the reasons given above, **IT IS ORDERED** that Defendant's Motion to Dismiss, (Dkt. 18), is **GRANTED**. Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE** for failure to state a claim upon which relief can be granted. The parties' Joint Motion to Extend Scheduling Order Deadlines, (Dkt. 31), is therefore **MOOT**.

**SIGNED** on December 22, 2025.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE